IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEYONA MCCREARY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 21-561 (MN) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

**<u>MEMORANDUM OPINION</u>**

Keyona McCreary, Wilmington, DE – Pro Se Plaintiff.

Shamoor Anis, Assistant United States Attorney, Wilmington, DE – Attorney for Defendant.

August 29 , 2024
Wilmington, Delaware

**NOREIKA, U.S. DISTRICT JUDGE:**

This medical malpractice case was removed from the Delaware Superior Court to this Court on April 21, 2021. (D.I. 1). Plaintiff Keyona McCreary's Second Amended Complaint is the operative pleading. (D.I. 37). Defendant now moves for summary judgment, alleging that Plaintiff has failed to establish an essential element of her medical negligence claim. (D.I. 75). The motion has been fully briefed. (D.I. 77, 79, 80). For the following reasons, the Court will DENY Defendant's motion.

**I.     BACKGROUND**

**A.     Factual Background**

The following facts are not contested. (*Compare* D.I. 75 at 7-11, *with* D.I. 77 at 3-13; *see also* D.I. 37 at 1-8). In early January 2019, Plaintiff saw Dr. Holmes for pain emanating from a tooth located on the right side of her mouth. (D.I. 75 at 7; D.I. 77 at 3). Approximately one week later, Dr. Holmes extracted the tooth. *Id.* Before performing the extraction, Dr. Holmes evaluated the tooth and found it to be grossly decayed with a hopeless prognosis. *Id.* During the procedure, Dr. Holmes administered anesthetic and made an incision into Plaintiff's gums. (D.I. 75 at 7). Dr. Holmes extracted the tooth from its socket in pieces, and mid-procedure, she took an x-ray of the extraction site. (D.I. 37 at 2; D.I. 77 at 5). At the end of the procedure, Dr. Holmes used a dental sponge and gauze to stop bleeding. (D.I. 75 at 7). Dr. Holmes did not prescribe antibiotics pre-procedure or use them during the extraction. (D.I. 75 7-8; D.I. 77 at 3-5). Afterwards, Dr. Holmes did not take an x-ray of the extraction site for verification purposes, she did not close the extraction site with sutures, and she did not prescribe a regimen of orally ingested antibiotics for Plaintiff to take post-procedure. *Id.* Dr. Holmes instructed Plaintiff to return the next day for a follow-up appointment. (D.I. 75 at 8).

1

The next day, Plaintiff went to the Wilmington Hospital emergency room for severe pain on the right side of her face, and she was referred to the oral surgery clinic. (D.I. 75 at 8; D.I. 77 at 5). The oral surgery clinic examined Plaintiff's tooth socket, performed a curettage and local debridement, and rinsed the extraction site before prescribing Plaintiff an amoxicillin regimen and discharging her. (D.I. 75 at 8; D.I. 77 at 5-6). Roughly a week later, Plaintiff returned to the oral surgery clinic and reported pain in her right ear and sinus, which the clinic evaluated as unlikely to be related to her dental procedures. (D.I. 75 at 8; D.I. 77 at 6). Plaintiff then visited an ear, nose, throat, and allergy ("ENTA") clinic later that month. (D.I. 75 at 9; D.I. 77 at 7-8). The ENTA clinic ordered a computed tomography ("CT") scan, which did not show signs of sinus disease but did show an abnormality requiring further evaluation by a dentist or doctor. *Id.*

In early February, Plaintiff met with her primary care physician. (D.I. 75 at 9; D.I. 77 at 9-10). Upon patient examination and consultation with the oral surgery clinic, Plaintiff's primary care doctor diagnosed her with trigeminal neuralgia, a chronic nerve pain disorder, for which the doctor prescribed Tegretol. *Id.* Also in February, Plaintiff returned to the oral surgery clinic, where a clinician, Dr. Chi, reviewed Plaintiff's CT scan. (D.I. 75 at 9-10; D.I. 77 at 8-9). From the CT scan, Dr. Chi observed something opaque in Plaintiff's tooth socket, noted that it appeared to be 2 millimeters in size, and recommended debridement, alveoloplasty, and removal. *Id.*

In March, Dr. Chi performed a surgical debridement and alveoloplasty on Plaintiff's tooth socket. (D.I. 75 at 10; D.I. 77 at 10). Shortly after the procedure, Plaintiff reported that the pain in her tooth socket had subsided. (D.I. 75 at 11; D.I. 77 at 11). The next month, Plaintiff saw Dr. Chi for a follow up appointment, during which Dr. Chi did not recommend additional dental procedures but did recommend that Plaintiff continue with Tegretol for nerve pain. (D.I. 75 at 11; D.I. 77 at 11-12). Plaintiff continued to report pain attributed to trigeminal neuralgia into

November 2019.  (D.I. 75 at 11; D.I. 77 at 12-13).  In November 2019, Plaintiff had a magnetic resonance imaging ("MRI") scan, from which a neurologist confirmed the trigeminal neuralgia diagnosis.  *Id.*

### B. Expert Witness Evidence

The expert witness evidence of record includes a written summary of facts and opinions by Dr. Cheppa (referred to herein as the "Written Assessment") (D.I. 41) and a transcript of a subsequent deposition with Dr. Cheppa (D.I. 76), both of which are summarized below.

#### 1. Written Assessment

In his Written Assessment, Dr. Cheppa notes that he would have taken some preventative steps if presented with Plaintiff's case, such as better documenting Plaintiff's dental history and prescribing amoxicillin leading up to the scheduled extraction.  (D.I 41-1 at 2).  He explains that he would have prescribed antibiotics pre-procedure because pain emanating from a grossly decayed tooth is likely the result of infection and inflammation.  *Id.*  Dr. Cheppa also opines that he would have kept more detailed notes regarding the specific treatment options presented to Plaintiff pre-procedure and the extraction procedure itself.  *Id.* at 2-3.  Post-procedure, Dr. Cheppa states that he would have used sutures to close the extraction site and he would have prescribed antibiotics for proper healing.  *Id.* at 3.  He also notes that Dr. Holmes did not take an x-ray post-procedure to verify that the tooth had been fully removed.  *Id.* at 5.

Dr. Cheppa also expresses concern about the fact that the tooth extraction performed by Dr. Holmes resulted in a referral for additional oral surgery and did not appear to be a complete removal, and about the fact that Plaintiff received a trigeminal neuralgia diagnosis following post-procedure complications.  *Id.* at 4.  Dr. Cheppa notes that Plaintiff's nerve pain could be linked to Dr. Holmes's use of anesthetic during the extraction process or Dr. Holmes's search for pieces of

tooth inside Plaintiff's tooth socket. *Id.* at 4-5. Finally, Dr. Cheppa states that referral to a specialist would have been an appropriate course of action. *Id.* at 5.

### 2. Deposition Testimony

In deposition, Dr. Cheppa was asked to opine more specifically what actions taken by Dr. Holmes were negligent or breached the standard of care. Dr. Cheppa offered some inconsistent statements when responding to these lines of questioning. For instance, Dr. Cheppa initially stated that his written assessment had concluded that Dr. Holmes was negligent in her extraction of Plaintiff's tooth (D.I. 76 at 492) but testified that he had never used the term "negligent" and that he had written that he would have done the procedure differently (*Id.* at 499). Throughout the deposition, Dr. Cheppa appeared hesitant to use the word "negligent," and on several occasions, he indicated that he considered it to be a legal term, not a medical term. (*Id.* at 495, 497, 499). Nevertheless, Dr. Cheppa stated that he believed it was negligent not to use sutures or prescribe antibiotics after the extraction of a decayed and likely infected tooth. (*Id.* at 497, 501, 509). Conversely, Dr. Cheppa declined to classify as negligent the specific and individual acts of not keeping better medical notes, not prescribing pre-procedure antibiotics, and not referring the procedure to a specialist. (*Id.* at 494, 507).

Dr. Cheppa appeared more comfortable discussing the applicable standard of care for the tooth extraction, although there were some inconsistencies in his deposition statements on this subject as well. For instance, Dr. Cheppa testified at one point that it is hard to determine the standard of care because it is dependent on the situation and it comes down to a practitioner's clinical judgment of what the situation requires. (*Id.* at 501). Yet Dr. Cheppa also testified that his understanding of the standard of care is "what is usually done." (*Id.* at 499). He then stated, "I think the usually done things would probably fall on the side of if you did a surgical procedure on an infected tooth remnant, I know I would cover it with antibiotics, and I'm pretty sure most

4

other people that I know would too." (*Id.*). Dr. Cheppa also affirmed that "a postoperative x-ray to confirm that there's nothing left in the socket" is part of the standard of care for the extraction of a broken tooth. (*Id.* at 506). Dr. Cheppa later stated that instructing a patient to use magic mouthwash post-procedure without also prescribing a regimen of orally ingested amoxicillin, or a comparable antibiotic, does not meet the standard of care for a complex tooth extraction. (*Id.* at 508-09). Finally, Dr. Cheppa stated that "the usual standard of care is to suture [the extraction site] closed." (*Id.* at 509). The record reflects that Dr. Holmes did not take the steps outlined above.

Finally, the topic of causation arose a number of times during Dr. Cheppa's deposition. For example, Dr. Cheppa asserted several times that Dr. Holmes had performed an incomplete tooth extraction, which resulted in Plaintiff's referral for additional oral surgery afterward. (*Id.* at 501-02, 504). Dr. Cheppa also discussed, in contrast, some positive outcomes of a tooth extraction performed in accordance with the standard of care, of which Plaintiff did not have the benefit. For instance, when discussing amoxicillin, Dr. Cheppa explained how using antibiotics prevents infection and leads to a better outcome, which includes less pain and downtime post-procedure. (*Id.* at 499). Similarly, Dr. Cheppa testified that suturing permits extraction sites to heal better and lowers the risk of secondary infection. (*Id.* at 501). Dr. Cheppa also discussed how post-procedure x-ray verification avoids further injury caused by things left behind in the extraction site. (*Id.* at 506). Regarding Plaintiff's trigeminal neuralgia, however, it was unclear from Dr. Cheppa's deposition responses whether he attributes Plaintiff's condition to Dr. Holmes's extraction, and if so, with what degree of certainty. (*Id.* at 504-06).

## II.   **LEGAL STANDARDS**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

5

Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of any genuine issues of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the burden of persuasion at trial would be on the non-moving party, then the moving party may satisfy its burden of production by pointing to an absence of evidence supporting the non-moving party's case, after which the burden of production shifts to the non-movant to demonstrate the existence of a genuine issue for trial.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Williams v. West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989).

Material facts are those "that could affect the outcome" of the proceeding.  *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011).  "[A] dispute about a material fact is genuine if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Id.* (internal quotation marks omitted).  A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the moving party] do not establish the absence . . . of a genuine dispute."  Fed. R. Civ. P. 56(c)(1).  The non-moving party's evidence "must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance."  *Williams*, 891 F.2d at 460-61.

The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).  "[T]he facts asserted by the nonmoving party, if supported by affidavits or other evidentiary material, must be regarded as true . . . ."  *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996).  If "there is any evidence in the record from any source from which a reasonable

6

inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment." *Id.* at 1081 (internal quotation marks omitted).

## III.   DISCUSSION

Plaintiff bears the initial burden of establishing a prima facie case of medical malpractice. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  As Defendant highlights on motion for summary judgment, under the applicable Delaware state law, Plaintiff "must produce expert medical testimony that specifies (1) the applicable standard of care, (2) the alleged deviation from that standard, and (3) the causal link between the deviation and the alleged injury" to establish a claim of medical negligence at this stage of the case.  *Green v. Weiner*, 766 A.2d 492, 494-95 (Del. 2001) (citing 18 Del. C. § 6853).  Defendant argues that Plaintiff has failed to provide sufficient expert witness evidence to satisfy the above-stated elements.  (D.I. 75.)

Before considering the merits of Defendant's argument, the Court notes that under Delaware state law, Plaintiff is "not required to provide uncontradicted evidence of the elements of [her] negligence claim," but Plaintiff must "provide credible evidence of each of these elements from which a reasonable jury could find in [her] favor." *Id.* at 495.  Furthermore, Delaware state law "does not require medical experts to couch their opinions in legal terms or to articulate the standard of care with a high degree of legal precision or with 'magic words,'" *id.*, but the law does require "a medical opinion from an expert witness to be based on a reasonable degree of medical probability," *Mammarella v. Evantash*, 93 A.3d 629, 638 (Del. 2014).

The Court considers Dr. Cheppa's Written Assessment and deposition testimony "as a whole."  *Barriocanal v. Gibbs*, 697 A.2d 1169, 1172-73 (Del. 1997); *see, e.g.*, *Simmons v. Bayhealth Med. Ctr., Inc.*, 950 A.2d 659 (Del. 2008).  Viewing the Written Assessment and deposition testimony in the light most favorable to Plaintiff, the Court finds the following.  First, Dr. Cheppa sufficiently articulated that, in his opinion, Dr. Holmes breached the applicable

7

standard of care when performing Plaintiff's tooth extraction.  In deposition, Dr. Cheppa testified that he drew this conclusion from the lack of antibiotics, sutures, and post-procedure x-ray verification utilized by Dr. Holmes.  (*See, e.g.*, D.I. 75 at 497-501, 506-09).  Second, Dr. Cheppa sufficiently opined for this stage of the case that the subpar tooth extraction resulted in referral for additional oral surgery, a heightened risk of infection, and probable increases in post-procedure pain and recovery time.  (*See, e.g.*, *id.* at 499, 501-02, 504-06).

Dr. Cheppa's responses during deposition appeared inconsistent at times, particularly when he was asked about what specific actions taken by Dr. Holmes rose to the level of medical negligence.  (*Compare* D.I. 75 at 12-14; D.I. 79 at 2-8, *with* D.I. 77 at 18-27; D.I. 80 at 3-6).  The Court does not find these inconsistencies to merit entry of summary judgment, as Plaintiff is not required to provide uncontradicted evidence to support her claim, and Dr. Cheppa is not required to speak with a high degree of legal precision.

Viewing the evidence in the light most favorable to Plaintiff, and regarding all supported facts she asserts as true, it can be reasonably inferred from Dr. Cheppa's Written Assessment and deposition testimony that, in his opinion, Dr. Holmes deviated from the applicable standard of care during Plaintiff's tooth extraction, and there was a causal link between the deviation and some of Plaintiff's alleged injuries.  As such, summary judgment, based on a lack of expert evidence required to prove the essential elements of a medical negligence claim, is not appropriate.

In keeping with the Court's prior orders on Plaintiff's motions for partial summary judgment (D.I. 54, 74), the Court declines to address the remaining arguments presented in Defendant's motion and party briefing because the Court's findings above render them non-dispositive.  As previously stated, it is the standard practice of this Court to limit its

8

consideration of motions for summary judgment in cases set for bench trial to motions that are case dispositive. (D.I. 36).

## IV. <u>CONCLUSION</u>

For the above reasons, the Court will deny Defendant's motion for summary judgment. (D.I. 75.)

An appropriate Order will be entered.